**CHESWELL, INC. and Wesfield Construction Co., Inc., Plaintiffs**

v.

**PREMIER HOMES AND LAND CORPORATION, James Kenney, Monson Savings Bank and Robert Ward, Defendants**

No. CIV.A.02–30115–KPN.

United States District Court, D. Massachusetts.

May 26, 2004.

Michael J. Coyne, Bacon & Wilson, P.C., Springfield, MA, for Monson Savings Bank, Defendant.

Deborah D. Ferriter, Bulkley, Richardson & Gelinas, Felicity Hardee, Bulkley, Richardson & Gelinas, LLP, Springfield, MA, for Cheswell, Inc., Wesfield Construction Co., Inc, Plaintiffs.

Robert M. Mack, Morrison, Mahoney & Miller, Springfield, MA, for Robert Ward, Defendant.

David J. Noonan, Attorney at Law, Amherst, MA, for Premier Homes and Land Corporation, James Kenney, Defendants, Pro Se.

### MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT MONSON SAVINGS BANK'S MOTION FOR SUMMARY JUDGMENT (Document No. 110)

NEIMAN, United States Magistrate Judge.

Presently before the court is Monson Savings Bank ("Bank")'s motion for summary judgment on Counts Thirteen and Fourteen of Cheswell, Inc. ("Plaintiff")'s

Second Amended Complaint.[1] The parties agree that these are the only counts which apply to the Bank. Count Thirteen claims that the Bank, together with other defendants perhaps, participated in a fraudulent transfer in violation of the Massachusetts Uniform Fraudulent Transfer Act ("UFTA"), Mass. Gen. L. ch. 109A. Count Fourteen makes a claim against the Bank for unfair and deceptive trade practices in violation of Mass. Gen. L. ch. 93A ("chapter 93A").

The parties have consented to this court's jurisdiction pursuant to 28 U.S.C. § 636(c). For the reasons which follow, the court will allow the Bank's motion for summary judgment. A separate memorandum and order issued this day addresses co-defendant Robert Ward ("Ward")'s motion for summary judgment.

## I. BACKGROUND

Plaintiff's assertions to the contrary, the facts pertaining to its claims against the Bank are not materially in dispute. In coming to this conclusion, the court has eliminated from consideration—at Plaintiff's request (see Document No. 120)— certain factual assertions which are based on portions of the affidavit of Michael Rouette, the Bank's Vice–President.

As explained in the court's ruling this day regarding Ward's motion for summary judgment, co-defendant Premier Homes and Land Corporation ("Premier") was a land developer and owner of real estate at 35–37 Main Street in Belchertown. A two acre portion of the real estate was the subject of a ground lease dated September 12, 2001, between Premier, as landlord, and Richard Harrington and James H. Loney d/b/a/ Chesterfield Investment ("Chesterfield"), as tenant. In applicable part, the ground lease granted Chesterfield the option to purchase for $1 two acres on which it intended to construct a new post office.[2]

The ground lease also contained the following provision, Article 20.01, specifically relating to Premier's right to further encumber the real estate: "[Premier] agrees that the Premises will not be encumbered by any mortgage, pledges, assignment or other financial obligations ('Financial Encumbrance'), unless the Financial Encumbrance is subject to the provisions of this Lease." At the time the ground lease was executed, Premier also granted Chesterfield a $60,000 mortgage to secure certain additional monies previously advanced by Chesterfield to Premier. Although dated September 12, 2001, the $60,000 mortgage was not recorded until February 7, 2002.

In the meantime, on October 24, 2001, Premier executed and delivered to the Bank a loan note for a line of credit of $550,000, together with a mortgage on the real estate. The mortgage was recorded in the registry of deeds that same day. At the time of the loan application, co-defendant James Kenney ("Kenney"), Premier's President, informed the Bank that Premier and Chesterfield had entered into the ground lease.

On or about February 5, 2002, the Bank loaned Premier $310,000 to refinance an existing loan owed by Premier to United Cooperative Bank. To secure that note,

**1.** Although there are in fact two plaintiffs, Cheswell, Inc. and Wesfield Construction Co., Inc. ("Wesfield"), their counsel acknowledged at oral argument that Wesfield has no claim against the Bank.

**2.** Article 1.10 of the ground lease made clear that $200,000 had already been paid toward the eventual purchase of the two acres. Article 15.09, in turn, allowed Chesterfield to record a "Notice or Memorandum of Lease" in the registry of deeds so as to place all parties on notice of its interest in the property. A Notice of Lease was not recorded until March 21, 2002.

Premier granted the Bank another mortgage on the real estate, which was recorded that same day in the registry of deeds. The Bank has since acknowledged that both the October 24, 2001 mortgage and the February 5, 2002 mortgage were taken subject to the provisions of the ground lease.[3]

During the first few months of 2002, after a dispute arose between Premier and Plaintiff, Plaintiff elected to exercise the option to purchase the two acre parcel for $1, as provided in the ground lease.[4] Premier refused to oblige. Notwithstanding that refusal, Plaintiff, starting on February 22, 2002, attempted to have the Bank discharge the mortgages granted it by Premier insofar as they covered the two acre parcel. The Bank refused, at least in part because Premier had not conveyed the property.

On March 6, 2003, Premier filed a Petition in Bankruptcy in the United States Bankruptcy Court for the District of Massachusetts. Although the petition was filed under Chapter 11 of the Bankruptcy Code, it was later converted to a Chapter 7 liquidation proceeding. On October 9, 2003, the Bankruptcy Court approved the transfer of the two acres from the Trustee in Bankruptcy to Plaintiff. The Trustee's deed was recorded on November 14, 2003, and the Bank thereupon discharged the mortgages as they applied to the parcel.

## II. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Although some facts may be disputed by the parties, the summary judgment standard requires that there be no genuine issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact creates a genuine issue for trial "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. Substantive law governs materiality, and only disputes over facts that might affect the outcome of the trial are material. *Id.* To avoid summary judgment, a plaintiff must make a sufficient showing of the elements essential to the case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. Discussion

The court will address the Bank's motion as it applies to Plaintiff's two claims. In the end, the court concludes that the Bank is entitled to summary judgment with respect to each claim.

### A. UFTA

As Defendant asserts, the overall purpose of the Massachusetts Uniform Fraud-

---

**3.** The mortgages themselves reveal that they were taken subject to an "Indenture of Lease dated October 18, 2000 by and between Premier ... and Wesfield ... relating to approximately 2.324 acres of land off Main Street in said Belchertown." (Affidavit of Michael R. Rouette (Document No. 113), Exhibits A and C.) Although the October 18, 2000 lease does not appear to be the September 12, 2001 lease which undergirds Plaintiff's claims here,

the Bank concedes that it had actual notice of the September 12th lease and that the mortgages were taken subject to it. (See Bank's Concise Statement of Material Facts (Document No. 112) ¶¶ 5 and 6.)

**4.** Unlike Ward, the Bank does not dispute for purposes here that, at the time, Plaintiff stood in Chesterfield's shoes.

ulent Conveyance Act ("UFCA"), the UFTA's predecessor, was "to preserve a debtor's assets so that creditors may look to them in the event that the debtor ceases payments or is declared bankrupt." *First Fed. Sav. & Loan Ass'n v. Napoleon*, 428 Mass. 371, 701 N.E.2d 350, 354–55 (1998). Although there are certain differences between the UFTA, which became effective October 8, 1996, and the UFCA, "[t]he UFTA generally follows the same structure and organization as the UFCA—it still requires proof of either 'actual fraud' or 'constructive fraud.'" Paul P. Daley & Mitchell Applebaum, *The Modernization of Fraudulent Conveyance Law: The Adoption of Unfair Fraudulent Transfer Act*, 83 Mass. L.Rev. 337, 339 (1998).

Plaintiff alleges in its complaint that Premier's debt to it, as described in the note and mortgage dated September 12, 2001, antecedes the mortgages which Premier granted the Bank. (See Complaint ¶ 82.) Moreover, Plaintiff alleges, "Premier did not receive reasonably equivalent value from [the Bank] in exchange for its grant of mortgages" and that "Premier gave mortgages on the subject property to [the Bank] to defraud Plaintiff[ ]." (*Id.* ¶¶ 83, 84). Finally, Plaintiff alleges that the Bank "had actual or constructive notice of the existence of the ground lease between the Plaintiff[ ] and Premier." (*Id.* ¶ 85.)

Given these allegations, the Bank, relying on section 5 of the UFTA,[5] argues that Plaintiff cannot establish that the Bank even made a "transfer" or that it was a "debtor." The Bank also argues that Plaintiff cannot establish that, at the time any transfer may have been made between Premier and the Bank, it was done with the intent of hindering, delaying or defrauding Plaintiff as a creditor of Premier.

---

**5.** In full, section 5 of the UFTA reads as follows:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed to reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

(b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Mass. Gen. L. ch. 109A, § 5.

In short, the Bank argues, Plaintiff cannot establish that the UFTA even applies to the transactions alleged in the complaint.

In counterpoint, Plaintiff asserts that the Bank misapprehends the basis of its UFTA claim and, in significant part, the court agrees. The claim, as Plaintiff explains, targets the Bank as a transferee of the mortgage and is grounded in sections 8(a)(1) and 9 of the UFTA. Section 8, entitled "Creditor's remedies," provides in subsection (a)(1) for avoidance of a transfer "to the extent necessary to satisfy the creditor's claim." Section 9, in turn, provides in subsection (b) that "to the extent a transfer is voidable in an action by a creditor under [section 8(a)(1)], the creditor may recover judgment for the value of the asset transferred ... or the amount necessary to satisfy the creditor's claim, whichever is less." Subsection (b) of section 9 goes on to provide that the judgment may be entered against, among others, "the first transferee of the asset or the person for whose benefit the transfer was made." Subsection (c) of section 9 then provides that, if a creditor recovers a judgment under subsection (b) which "is based upon the value of the asset transferred, the judgment shall be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require." *See also* Daley & Applebaum, 83 Mass. L.Rev. at 345 (noting that, when passed, the UFTA expanded creditors' rights against certain transferees).

Here, Plaintiff asserts, Premier first granted a $60,000 mortgage to Chesterfield on September 12, 2001. As previously described, that mortgage was not immediately recorded, a failure which Plaintiff now ascribes to both Ward and Kenney individually. Two days later, Premier, in the person of Kenney, met with Rouette, the Bank's Vice President, about a loan;

the loan summary prepared by Rouette, Plaintiff asserts, made no mention of the $60,000 mortgage. In any event, the Bank granted Premier the loan and took back a mortgage on Premier's Belchertown property, including the two acre parcel. Plaintiff contends that this mortgage, recorded on October 24, 2001—as well as the subsequent mortgage to the Bank dated and recorded February 5, 2002—was a "transfer" pursuant to the UFTA. A reasonable trier of fact, Plaintiff argues, could conclude that the transfer was made by Premier with the actual intent to hinder, delay or defraud Plaintiff.

■ Plaintiff is correct that a "transfer" includes the creation of a lien on a property. *See* Mass. Gen. L. ch. 109A, § 2 (defining "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance"). Accordingly, in the court's opinion, a plaintiff, in appropriate circumstances, can pursue a claim against a bank as a transferee even if the plaintiff had no direct business relationship with the bank.

■ Unfortunately for Plaintiff, however, its claim does not amount to a UFTA cause of action against the Bank—as distinct from Premier or, perhaps, Kenney—because the complaint merely alleges that *"Premier* gave mortgages on the subject property to [the Bank] to defraud Plaintiff[]." (Complaint ¶ 84 (emphasis added).) This is hardly a claim of fraud against the Bank itself. Similarly, the fact that the Bank had actual notice of the ground lease between Plaintiff and Premier, as alleged in paragraph 85, does not amount to a UFTA claim of fraud against the Bank. In other words, even were the court to assume that *Premier* was acting with fraudulent intent when it granted mortgages to

the Bank, there is no evidence, either direct or indirect, that *the Bank* was acting with fraudulent intent when it received the mortgages or that *the Bank* accepted the mortgages with knowledge of such intent on Premier's part.

Indeed, the only case upon which Plaintiff relies concerns transferees who were "conscious participants" in the fraud. *See Fleet Nat'l Bank v. Merriam*, 45 Mass. App.Ct. 592, 699 N.E.2d 1266, 1268 (1998). In such circumstances, the court found, "the creditor can recover from the transferees of fraudulently conveyed property." *Id.See also* Nolan E. Clark, *Recent Development, Tort Liability for Fraudulent Conveyances*, 19 Stan. L.Rev. 636, 639 (1967) ("In a suit for damages resulting from a fraudulent conveyance three classes of potential defendants are available: the debtor transferor, the transferee with knowledge of the fraud, and assisting third parties."); *Perkins v. Becker's Conservatories*, 318 Mass. 407, 61 N.E.2d 833, 836 (1945) (concerning "a conveyance in actual fraud ... without regard to the nature or amount of consideration"). Here, however, there is no evidence of such conscious participation in fraud or any other indicia of fraud on the part of the Bank.

Plaintiff argues nonetheless that certain factual issues preclude summary judgment. This argument, however, is raised in the most general of ways, and even Plaintiff's more specific claims are unhelpful to its position. For example, the fact that Rouette may have prepared a loan summary that made no mention of the mortgage to Plaintiff is of little moment. And even in the absence of evidence as to what Kenney told Rouette regarding Plaintiff's right to purchase the two acre parcel, it is undisputed that the Bank took its mortgage subject to the lease and that the lease clearly provided for Plaintiff's purchase of the parcel for nominal consid-

eration. Granted, there might be an issue as to what the Bank, in its discussions with Premier, agreed to do upon such conveyance, for the documents themselves are silent on this point; but this particular issue has nothing to do with the fraudulent transfer charge leveled against the Bank. *See Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996) ("A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law.") (citations and internal quotation marks omitted).

The only allegation from which it might possibly be inferred that the Bank acted in a manner violative of the UFTA is contained in paragraph 83 of the complaint which alleges that Premier "did not receive reasonably equivalent value from [the Bank] in exchange for its grant of mortgages." Although the title of Count Thirteen claims fraud, paragraph 83 raises the possibility that the Bank may have been unjustly enriched when it accepted the mortgages and thereby violated the UFTA. *Cf. Merchants Discount Co. v. Esther Abelson, Inc.*, 297 Mass. 517, 9 N.E.2d 528, 531 (1937) (observing that a non-fraudulent transfer may violate UFTA section 8 or 9 to the extent that there is "not a fair consideration" for the transfer). Plaintiff, however, has offered no evidence that the loan transactions between Premier and the Bank were accomplished in anything other than the "ordinary course" of the Bank's business, Mass. Gen. L. ch. 109A, § 4(a), or that the Bank received the mortgages without having granted Premier loans of "reasonable equivalent value," Mass. Gen. L. ch. 109A, § 4(b). *See also* Mass. Gen. L. ch. 109A, § 9(a) ("A transfer or obligation is not voidable under [section 5(a)(1) ] against a person who took in good-faith and for a reasonably equivalent value or against any subsequent transferee or obligee."); *Shay v. Gagne*, 275 Mass. 386, 176 N.E. 200, 202 (1931). These fail-

ures further undermine Plaintiff's UFTA claim against the Bank. *See Northborough Nat'l Bank v. Risley,* 384 Mass. 348, 424 N.E.2d 522, 523 (1981) ("transferee who was used as an instrument by the debtor" was not liable when "[h]is knowledge of the facts was minimal [and] he sought and received no benefit from the transactions"). Moreover, Plaintiff has offered no evidence that the Bank purposefully attempted to get a superior lien.

With regard to this last point, it must be remembered that Plaintiff's claim against the Bank would never have arisen had the $60,000 mortgage which Premier first granted Chesterfield been recorded on September 12, 2001, when it was executed. (It was not until October 24, 2001, that the first of the two mortgages Premier granted the Bank was executed and recorded; the second mortgage was recorded on February 5, 2002.) But, alas, Plaintiff's $60,000 mortgage was not recorded until February 7, 2002, and, as explained to the court by the parties, this evidently caused the Bankruptcy Court to give the Bank's mortgage priority. As a result, the Bank was able to receive the bulk of the proceeds from the sale of the remaining property by the Trustee. To be sure, Plaintiff did receive the two acre parcel, but it did not receive a payout of the $60,000 mortgage it held.[6] In the end, therefore, the court has little choice but to conclude that summary judgment should enter with respect to Plaintiff's UFTA claims against the Bank.

B. *Chapter 93A*

■ As mentioned, Count Fourteen claims that the Bank engaged in unfair and deceptive acts or practices which caused Plaintiff harm. This claim is centered on the Bank's refusal to release its remaining mortgage on the two acre parcel once Plaintiff chose to exercise its purchase option. The claim relates as well to the Bank having received mortgages from Premier covering more property, i.e., the two acre parcel, than the Bank assertedly wished to have secured.

■ The Bank asserts—and the court agrees—that, even when considering the facts in a light most favorable to Plaintiff, its conduct cannot, as a matter of law, constitute unfair and deceptive practices in violation of chapter 93A. As the parties are well aware, acts and practices under chapter 93A, to be compensable, "must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce," i.e., they must be "immoral, unethical, oppressive, or unscrupulous." *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979). *See also Williams v. Arndt,* 626 F.Supp. 571 (D.Mass.1985); *Quaker State Oil Ref. Corp. v. Garrity Oil Co.,* 884 F.2d 1510, 1513 (1st Cir.1989). Simply put, that did not occur here.

The ground lease expressly granted Premier the right to mortgage the real estate, subject to the lease itself. That is precisely what happened. Moreover, the ground lease was silent with regard to the terms and conditions upon which subsequent mortgages would be discharged relative to the two acre parcel. Granted, the ground lease might fairly be read to require such

6. As this court noted at oral argument, the Bank's mortgages, as the Bank concedes, were taken subject to the ground lease which, in turn, describes not only Plaintiff's right to purchase the two acre parcel, but the $60,000 mortgage as well. The court wondered aloud whether this would give the $60,000 mort- gage priority over the Bank's mortgages, even though it had not been recorded earlier. In response to these musings, Plaintiff indicated that it had not offered this particular analysis to the Bankruptcy Court while the Bank opined that the issue has been foreclosed by the Bankruptcy Court's rulings to date.

discharges once the two acre parcel was conveyed by Premier to Plaintiff. But, as described, the parcel was never conveyed because Plaintiff, at least as alleged by Premier, failed to abide by certain oral agreements it had with Premier, if not the terms of the ground lease itself. These justifications on Premier's part, of course, have nothing to do with the Bank; they are the charges which Premier, as well as Kenney, raise in counterclaim against Plaintiff. In sum, the Bank cannot be said to have been under an obligation to Plaintiff to discharge its outstanding mortgages when Premier itself was refusing to convey the secured parcel.

Still, as Plaintiff argues, a bank which acts with improper motive to obtain a financial advantage for itself, even when it conforms to all legal requirements, may nonetheless be charged under chapter 93A in certain instances. *See, e.g., Kattar v. Demoulas,* 433 Mass. 1, 739 N.E.2d 246, 247 (2000) (holding that chapter 93A action may lie "where foreclosure of a mortgage, even on an actual default, is conducted in bad faith to the detriment of the mortgagor"); *Morse v. Mutual Fed. Sav. & Loan Ass'n,* 536 F.Supp. 1271, 1281–82 (D.Mass. 1982) (holding mortgagee's foreclosure proceedings for ulterior purpose of collecting mortgagor's bad check indebtedness was wrongful and in violation of chapter 93A). In the court's opinion, however, these instances do not include the scene which Plaintiff tries to paint here. *See Kattar,* 739 N.E.2d at 257 ("unfair and deceptive conduct is best discerned from the circumstances of each case") (citations and internal quotation marks omitted). First, there was nothing between Plaintiff and the Bank which is at all comparable to the client relationship between the mortgagor and the mortgagee in *Kattar.* Second, nothing has been proffered here which even approaches the sordid facts in *Kattar,*

i.e., a mortgagee's retribution for the mortgagor's refusal to testify falsely in an unrelated matter.

The other cases relied on by Plaintiff are no more helpful to its cause. For example, in *Tufankjian v. Rockland Trust Co.,* 57 Mass.App.Ct. 173, 782 N.E.2d 1 (2003), a bank was found to have violated its duty of good faith and fair dealing, as well as chapter 93A, when it reneged on a commitment letter and then indicated that it would lend the buyer the money, but at a higher interest rate. *See also Anthony's Pier Four, Inc. v. HBC Assoc.,* 411 Mass. 451, 583 N.E.2d 806, 820 (1991) (discussing parties' obligations with respect to a contract). Here, in contrast, there was neither a contract nor an agreement nor even a relationship between the Bank and Plaintiff.

Of course, had Premier conveyed the two acre parcel to Plaintiff upon Plaintiff's exercise of its right to purchase, and had the Bank *then* refused to discharge its mortgage to gain a financial advantage, Plaintiff may well have had a claim against the Bank. But those are not the facts, and such facts as do exist cannot be said to amount to unfair or deceptive acts or practices on the part of the Bank. Accordingly, even when viewed in a light most favorable to Plaintiff, the facts fail to support a claim against the Bank under chapter 93A.

## IV. CONCLUSION

Many things may be said to have gone awry in the development of the Belchertown property and it remains to be seen how the remaining claims and counterclaims play out. But whatever happened, the Bank cannot be held to account to Plaintiff for the claims alleged here. Accordingly, for the reasons stated, the court

hereby ALLOWS the Bank's motion for summary judgment.

IT IS SO ORDERED.